## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

OPTIMUM STRATEGIES FUND I, LP        :   CIVIL ACTION NO.:

v.                                   :

UNITED STATES OIL FUND, LP and       :   APRIL 6, 2022
UNITED STATES COMMODITY
FUND, LLC

_____

## **COMPLAINT**

### **Statement of Jurisdiction and Venue**

1.      The plaintiff, Optimum Strategies Fund I, LP ("Optimum" or the "Plaintiff") is a Delaware limited partnership with a general partner, Optimum Strategies, LLC, a Connecticut limited liability company with its principal place of business 849 Black Rock Turnpike, Easton, CT 06612.

2.      The defendant, United States Oil Fund, LP ("USO") is a Delaware limited partnership, organized on May 12, 2005, with its principal place of business at 1850 Mt. Diablo Boulevard, Suite 640, Walnut Creek, California 94596.  USO is controlled by United States Commodity Funds, LLC ("USCF"), a Delaware limited liability company.

3.      USO is a commodity pool operator.  USO is also a security called an exchange-traded fund that provides investment exposure to oil markets (the "Fund").  The Fund's shares trade on the NYSE under the symbol "USO."

4.      The defendant, United States Commodity Fund, LLC ("USCF") general managing partner for the Fund.  USO pays USCF a management fee and grants USCF full management control of USO.  USCF is a single member limited liability company that was

formed in the state of Delaware on May 10, 2005, and maintains its main business office at 1850 Mt. Diablo Boulevard, Suite 640, Walnut Creek, California 94596.

5.      The claims alleged herein arise under Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC").

6.      This Court has jurisdiction pursuant to 28 U.S.C. §1331 based upon federal question jurisdiction.  This Court also has jurisdiction pursuant to 15 U.S.C. §78a(a).

7.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because USO shares trade in this District and the dissemination of false and misleading information was disseminated in this District.

8.      Throughout the period alleged in the Complaint, Defendant directly or indirectly used interstate wires and telephone lines to disseminate the information.

**Oil ETFs and Futures**

9.      An exchange-traded fund ("ETF") is similar to a mutual fund in that it issues shares and then uses the proceeds from the sale of these shares to invest according to its stated investment strategy and objective.  However, unlike mutual funds, ETFs issue their shares first to authorized participants through a marketing agent who then distributes and sells the shares to investors.  This allows the ETFs to trade on an exchange throughout the trading day without being directly created or redeemed by the issuer.

10.     Oil ETFs allow retail investors and speculators to invest in products tied to oil prices and/or the energy market that can be easily traded directly in investors' brokerage accounts.  Owning oil ETFs that track futures contracts (as opposed to stocks of oil and gas companies) is one of the most convenient ways for investors to seek exposure to oil markets as

trading futures through a broker can be a cumbersome process and require a significant initial investment.  Moreover, most retail investors are not equipped to buy and sell barrels of oil or authorized to trade oil futures contracts directly, so they utilize ETFs such as USO to make investments based on the price of oil.  Unlike equity ETFs, oil ETFs are not backed by the physical stock or asset, but rather trade futures contracts for barrels of oil in a particular oil market.

11.     A futures contract is a legal agreement to buy or sell a particular commodity at a predetermined price at a specified time in the future.  The buyer of a futures contract assumes the obligation to buy and receive the underlying asset at a specified date, while the seller of a futures contract assumes an obligation to deliver the underlying asset at a specified date.  Futures contracts can be used to hedge other invetments, to protect against fluctuations in the price of a commodity, or as a speculative investment.  Futures contracts are also used by industrial users to ensure supply at a guaranteed price.  As futures contracts approach maturity, their prices tend to converge with prices in the physical spot market.

12.     Many traders and portfolio managers are not interested in delivering or receiving the barrels of oil referenced by oil futures contracts.  Instead, such investors seek to profit from fluctuations in the price of oil.  Futures contracts can be utilized for this purpose without requiring receipt of the underlying physical asset, so long as the trade is closed before contract maturity.  Oil ETFs utilize futures contracts in this way.  When the futures contracts held by an oil ETF approach maturity, the ETF must "roll" its position to a future dated futures contract by selling the contract approaching maturity and replacing the maturing contract with a replacement contract with a different maturity date in order to avoid having to take physical delivery of the oil.

**USO**

13.     USO was organized in 2005 and first began offering shares to the public in 2006. USO is designed to allow investors to gain exposure to fluctuations in the price of oil.  The Fund's purposed investment objective is for the daily changes in percentage terms of its per share net asset value ("NAV") to reflect the daily changes in percentage terms of the spot price of West Texas Intermediate ("WTI") light, sweet crude oil delivered to Cushing, Oklahoma.  The Fund measures changes in the spot price of oil by reference to the daily changes in the price of specified short-term WTI futures contracts traded on the New York Mercantile Exchange (the "NYMEX") – which USO dubs the "Benchmark Oil Futures Contract" – plus interest earned on USO's collateral holdings, less USO's expenses.

14.     The Fund's Benchmark Oil Futures Contract refers to the WTI futures contract that is the nearest month contract to mature (i.e., the "front" month), except when the nearest month contract is within two weeks of expiration, in which case it refers to the futures contract that is the next month contract to mature.  USO states that it seeks to achieve its investment objective by investing so that the average daily percentage change in its NAV over any 30-day period will be within plus or minus 10% of the daily percentage change in the price of the Benchmark Oil Futures Contract over the same period.  Until recently, USO's stated investment strategy was to invest substantially all of its assets in front month WTI futures contracts, which were then rolled, in order to closely track the Benchmark Oil Futures Contract.

15.     USO held itself out to the market as a passively-managed fund that simply invested all Fund assets into near months WTI futures contracts so as to most closely track the spot price of oil.  If USO issued new shares, USCF would invest the cash raised from those share sales in more near months WTI futures contracts, regardless of whether doing so would result in

profits or losses for the Fund. No trader at USO attempted to adapt the Fund's investment strategy to market movements. In this way, the Fund would follow its stated investment strategy to buy front month WTI futures contracts in an effort to track the spot price of crude oil whether or not USCF thought the price for those contracts offered a favorable investment opportunity.

16.      The Fund's NAV per share is calculated as the current market value of its total assets, minus any liabilities, and dividing that total by the total number of outstanding shares. USO publishes its NAV per share daily after 4:00 p.m. Eastern Time on its website.

**USO Suffers Adverse Trends And The Breakdown In Market Fundamentals As A Result Of Its Own Market-Distorting Activities**

17.      In early 2020, the convergence of the rapid spread of COVID-19 and disputes between major oil-producing countries created turmoil in oil markets. In early January 2020, the World Health Organization ("WHO") announced the discovery of a new virus which causes COVID-19. On January 23, 2020, Chinese authorities placed the 11-million-person city of Wuhan under quarantine in an effort to contain the rapid spread of the virus. A week later, the WHO declared COVID-19 a global public-health emergency, and the next day the United States banned foreign nationals from entering the U.S. if they had travelled to China within the prior two weeks. Shortly thereafter, the U.S. declared to be COVID-19 a public health emergency.

18.      By February 2020, COVID-19 had begun to have a significant impact on commodity markets. On February 4, 2020, the price of WTI crude fell below $50 per barrel, from more than $58 per barrel just two weeks previously. By February 9, 2020, the death toll in China had surpassed that of the SARS epidemic in the early 2000s. Between February 12 and 21, 2020, the international expansion of COVID-19 accelerated, with South Korea, Iran and Italy suffering outbreaks. On February 13, 2020, China began turning away oil tankers as the country's lockdown intensified. On February 24, 2020, *Reuters* reported that oil prices,

including crude futures, slid 4% "as the rapid spread of [the] coronavirus in several countries outside China left investors concerning about a hit to demand." On February 25, 2020, San Francisco declared a global emergency, with several California counties following suit over the ensuing week. The United States reported its first death from COVID-19 on February 29, 2020 (though later reports would confirm that an earlier death in fact occurred on February 6, 2020).

19.    Around the time, trading in WTI futures contracts accelerated as investors tried to capitalize on the volatility of the markets. By the end of February, more than one million WTI front month futures contracts were being exchanged daily, nearly double the five-year averages. Between February 26, 2020 and March 2, 2020, the 15-day historical price volatility for front month WTI futures contracts jumped from 30% to 44%. Historical price volatility measures price fluctuation as a percentage deviation from the mean over a period of time. High volatility indicates increased investment risk. Accordingly, front month WTI futures contracts were becoming increasingly risky.

20.    To deal with slumping oil prices, on March 5, 2020, Saudi Arabia and other Organization of the Petroleum Exporting Countries ("OPEC") countries announced a proposal to cut oil output by 1.5 million barrels a day, or about 1.5% of global daily production. However, for the Saudi proposal to maintain price stability, Russia and other non-OPEC oil exporting countries would also need to agree to limit production. On March 6, 2020, after a two-day meeting in Vienna to attempt to reach a deal, Russia walked away from negotiations. Shortly thereafter, Saudi Arabia abruptly switched to instigating an all-out price war.

21.    On March 8, 2020, Saudi Arabia shocked global oil markets by announcing price discounts for its oil exports to $6 to $8 per barrel to its customers in Europe, Asia and United States. The move threatened to overwhelm global oil markets with supply even as demand

plummeted due to the increasing coronavirus restrictions being pursued by government authorities around the world.  Russia responded in kind, and soon the two countries were flooding global markets with cheap oil as they sought to capitalize on a unique opportunity to drive smaller competitors out of the oil business.

**USO's Investment Objective And Portfolio**

22.     According to USO's March 23, 2020 Prospectus (the "Prospectus"), as supplemented April 1, 2020, USO's investment objective was for "its shares' per share net asset value ("NAV") to reflect the daily changes in percentage terms of the spot price of light, sweet crude oil delivered to Cushing, Oklahoma, as measured by the daily changes in the price of a specified short-term futures contract on light, sweet crude oil called the 'Benchmark Oil Futures Contract.'"

23.     Although the Prospectus discloses that USO may invest in "Oil Futures Contracts" other than the Benchmark Oil Futures Contract, as well as "Other Oil-Related Investments" prior to mid-April 2020, USO had historically invested primarily in the Benchmark Oil Futures Contract, otherwise known as the "front month futures contract."

24.      Beginning in mid-April 2020, however, USO gradually changed the composition of its investment portfolio due to market events and resulting regulatory restrictions and limitations imposed by its futures contract merchant ("FCM"), decreasing its concentration of investments in the Benchmark Oil Futures Contract and leading to a diversification of investments ranging from the front month futures contracts to contracts which matured in later months.  Just before or while making these April changes to its investment portfolio, USO filed a form 8-K, with the first such Form 8-K dated April 16, 2020 and the last such Form 8-K dated April 30, 2020.  In the April 30 Form 8-K, USO provided a waterfall describing its future

intended investment decision making, starting with investment in the front month futures contract and ending with investment in Other Oil-Related Investment.

**Oil "Goes Negative"**

25.     On April 3, 2020, the first of a series of April exchange notices were issued to certain market participants addressing the possibility of negative pricing of energy futures contracts.  Before these issuances, there was market uncertainty as to whether futures exchanges would support oil going negative, *i.e.*, whether oil futures contracts could settle at a price below zero.

26.     Soon thereafter, on April 20, 2020, the May WTI Oil Futures Contract, which was set to expire April 22, 2020, in fact breached zero for the first time ever, settling that day at $37.63.

**Increasing Inflows Into USO**

27.     Simultaneous with these oil market events, USO experienced record daily inflows into the pool, including from a substantial number of retail investors.  For example, on April 13, 2020, USO experienced its second-largest inflows in the pool's history, and then, on April 16, 17, and 20, 2020, it experienced single-day record inflows, with each day surpassing the prior day's newly-established record.

28.     As a result of these record daily inflows, USO exhausted its inventory of shares on April 21, 2020, and on that same date, it filed a current report on Form 8-K announcing that it had sold all of its shares and therefore was suspending new creations of shares.[1]  In anticipation of exhausting its inventory of shares, USO on April 20, 2020 filed a Form 8-K announcing its

---

[1]  As an ETF, USO trades on the NYSE Arca after its shares are initially purchased by authorized participants, i.e., institutional firms that purchase shares in blocks of 100,000 called "baskets" through USO's marketing agent, with the price of a basket equal to the shares' NAV.  These initial purchases are referred to as "creations."  USO continuously issues new shares until its inventory is exhausted.  To the extent USO's inventory is exhausted, new

exhaustion of existing shares and on the same day filed a registration statement on Form S-3 seeking to register an offering of additional shares.

**FCM's Limitations On New Contracts**

29.     After oil went negative on April 20, 2020, the FCM, then USO's sole futures contracts merchant, imposed certain limitations on USO pursuant to its account agreement.  In particular, on April 22, 2020, the FCM conveyed on a telephone call with USO a newly-imposed New Creations Limit, which the FCM confirmed in an April 23, 2020 e-mail.

30.     As a result of this New Creations Limit, USO was restricted from investing in oil futures contracts that would allow it to meet its investment objective and instead would be limited to investing such proceeds in U.S. Treasuries or cash equivalents or simply holding them as cash.  Therefore, the New Creations Limit presented the likelihood of substantial tracking error between USO's investment objective and its NAV whenever new shares were registered and the corresponding suspension of new creations announced on April 21, 2020 was lifted.

31.     On April 23, 2020, the FCM e-mailed formal notification of the New Creation Limit to USO, stating in relevant part: "[A]s discussed on our call, in light of current market conditions, [FCM] is not wiling to expand the risk profile of the clearing relationship through new creations and additional increases in risk . . . ."  And, the FCM again communicated the New Creations Limit in an e-mail sent to USO the morning after that, on April 24, 2020: "As a clarification to yesterday's note, [FCM] is not prohibiting the rebalance of the portfolio but [FCM] is not willing to expand the risk profile of the clearing relationship through new creations and additional increases in risk."  That same evening, USO responded, "We will keep you posted on all developments and understand your comments below."

---

creations are suspended until a new registration statement to register the offering of additional shares is filed and declared effective.

**USO's Disclosures Following New Creations Limit**

32.     In a Form 8-K dated April 24, 2020, USO first publicly referenced certain "risk mitigation measures" imposed by the FCM.  In pertinent part, USO stated in the April 24 Form 8-K that, along with certain other circumstances, "risk mitigation measures imposed by USO's futures commission merchant . . . further limit USO and other market participants from investing in crude oil futures contracts in certain months," thereby "caus[ing] USO to invest in Oil Futures Contracts other than the Benchmark Oil Futures Contract."  The April 24 form 8-K did not mention the FCM's limit on USO's ability, if it had shares available for sale, to invest the proceeds generated by new creations in any oil futures contracts.

33.     In a Form 8-K dated April 27, 2020, USO repeated the above-referenced language.  Moreover, following a description of "USO's Current Investment Intentions," USO included this additional language: "The foregoing investment intention announced in this Form 8-K could change as a result of any or all of the following: . . . additional or different risk mitigation measures taken by USO's FCM with respect to USO acquiring additional Oil Futures contracts . . . ."  The New Creations Limit would not qualify as an "additional or different risk mitigation measure[]" that could cause a change to USO's investment intention, as the FCM had already imposed that limit five days earlier.

34.     In a pre-effective amendment dated April 27, 2020, USO amended the registration statement it had previously filed on April 20, 2020, including among its revisions a repetition of the above-referenced language from the April 24 Form 8-K.  And, in a Form 8-K dated April 30, 2020, USO explicitly referred back to its references to futures commission merchant "risk mitigation measures" in prior Filings, stating "[a]s previously disclosed, various factors including, but not limited to, . . . risk mitigation measures imposed by FCMs on USO and other

market participants, have severely limited USO's ability to invest in the Benchmark Oil Futures Contract and certain of the other investments in which USO traditionally would have invested in a substantial portion of its portfolio." Finally, in another pre-effective amendment dated May 6, 2020, USO amended its registration statement again, but references to futures commission merchant "risk mitigation measures" only used language that, in substance, resembled that found in the April 24 and 30 Forms 8-K.

### FCM's Inquiries As To USO's Outreach To Commission

35.    Although USO disclosed "risk mitigation measures imposed by [its] futures commission merchant" in various filings, it did not fully disclose the New Creations Limit, rendering statements it made misleading. Despite USO's failure to fully disclose the New Creations Limit in the above-referenced filings, the limit remained in place through late-April and into May 2020, with the FCM periodically re-emphasizing in e-mails and conversations with USO that the FCM was not willing to expand the risk profile of their clearing relationship through new creations. For example:

- In a May 5, 2020 e-mail, the FCM included that "[u]nfortunately we will not be able to accommodate new creations;"

- In a May 6, 2020 e-mail, the FCM stated, "We need to reiterate our position limits as attached correspondence of April 23 remain in effect and [FCM] is not willing to expand the risk profile of our clearing relationship through new creations;"

- During a May 7, 2020 telephone call, the FCM "reiterated we [are] not willing to accept new creates;" and

- In a May 10, 2020 email, the FCM stated, "[L]et me reiterate our position that [FCM] is currently not willing to accept additional positions resulting from new

creates, and indeed is seeking to reduce our overall exposure we have as the sole FCM to USO."

36.     During this same time period, USO had advised the FCM of its belief that its registration statement may imminently be declared effective, and USO sought relief from the New Creations Limit in anticipation of such a declaration.  For example, in a May 10, 2020 e-mail, USO explained that, when the registration statement becomes effective, "[s]ome people will surely create" so "we should be prepared for anything" because "[w]e could open with $200M, $500M…we really don't know," continuing we "cannot gate creations,[s]o [we] need [FCM], our only source of exposure, to meet whatever need materializes."

37.     Between around May 6 and 10, 2020, USO and the FCM, including, at times, legal counsel for both entities, discussed, among other things, USO's plans in the event that it was able to issue new shares, including whether USO had informed SEC staff of the New Creations Limit.  For example, on May 10, 2020, the FCM asked USO whether SEC staff knew of "position limits imposed by both the exchange and FCM and the impact that would have on new creations?"  USO responded that on "advice of counsel" it was "unable to disclose information about conversations with our regulators."

38.     On May 11, 2020, USO again amended its registration statement, filing another pre-effective amendment.  This pre-effective amendment again did not fully disclose the New Creations Limit.  Later that day, the FCM itself informed SEC staff of the New Creations Limit.  On May 13, 2020, SEC staff sent USO a comment letter on USO's May 11 pre-effective amendment to the registration statement, including the following comment: "Please describe the specific constraints placed on you by your FCM and how those constraints impact your ability to

invest in the Benchmark Oil Futures Contract, the ICE WTI Contract or any other oil futures contracts."

39.     By failing to adequately inform the investing public, during the period April 24 through May 21, 2020, of the specific constraints put on the Fund and, in turn, the impact that those constraints would have on the Fund's ability to meet its investment objective, each of the above public filings were materially misleading.

40.     For example, a relevant section from the pre-effective amendment was changed from the simple statement that "FCMs and other market participants have taken risk mitigation measures that constrain USO's ability to invest in the Benchmark Futures Contract and the ICE WTI Contract" in the May 11 pre-effective amendment, to the following in the May 21 pre-effective amendment:

> [FCM] and other market participants, including other FCMs, have taken risk mitigation measures that constrain USO's ability to invest in the Benchmark Futures Contract and other Oil Futures Contracts.  [FCM, currently USO's only FCM, has expressly informed USO that, until further notice, USO may not hold positions in the Benchmark Futures Oil Futures Contract and that it may not purchase any other Oil Futures Contracts for USO's portfolio through [FCM] whether or not such purchases would be within the limits permitted by the exchanges. . . . USO cannot predict with any certainty when and whether [FCM] will remove these limitations.  USO has been engaging in efforts to enter into additional FCM agreements for the purpose of the purchase and sale of Benchmark Oil Futures Contracts as well as other Oil Futures Contracts.  To date, USO has not entered into an agreement with any FCM other than [FCM] and it cannot predict with any certainty when it will do so.

41.     Furthermore, USO added to the pre-effective amendment an explicit Risk Factor addressing the New Creations Limit titled "Risk mitigation measures imposed by USO's FCM have the potential to cause tracking error by limiting USO's investments, including its ability to fully invest in the Benchmark Futures Contract and other Oil Futures Contracts, which could

cause the price of USO's shares to substantially vary from the price of the Benchmark Oil

Futures Contract."  In relevant part, USO described how the New Creations Limit could

constrain USO's ability to meet its investment objective going forward:

> In addition, if USO were to again offer Creation Baskets for
> purchase, it is anticipated that the limitations being imposed by the
> exchanges and USO's FCM will significantly limit USO's ability
> to invest the proceeds of the purchases of Creation Baskets in Oil
> Futures Contracts.  Assuming this to be the case, if USO sells
> Creation Baskets again, USO would invest in other permitted
> investments, including Other Oil-Related Interests, and may hold
> larger amounts of Treasuries, cash and cash equivalents, which
> will further impair USO's ability to meet its investment objective.

42.     USO was eventually able to enter into agreements with additional futures

commission merchants, as disclosed in Forms 8-K dated May 29 and June 9, 2020, which would

allow USO to invest the proceeds of the sale of new USO shares in oil futures contracts.

43.     On June 12, 2020, the USO registration statement was declared effective, and a

prospectus was filed for the offering of additional shares.  At this point, USO had new shares

available for sale for the first time since April 21, 2020.

44.     On May 29, 2020, it was reported that the SEC and the CFTC had both launched

investigations into USO regarding the propriety of the Fund's disclosures to investors and the

Fund's rapid-fire changes to its investment strategy.  Around this same time, the SEC required

the Fund to revise many of its disclosures and representations to investors, including by requiring

USO to prominently announce on the cover page of its prospectus that the Fund "**IS NOT A**

**PROXY FOR TRADING DIRECTLY IN THE OIL MARKETS**."  This new disclosure

stood in stark contrast with Defendant's prior representations that "USO's investment strategy is

designed to provide investors with a cost-effective way to invest indirectly in crude oil."

45.     On August 17, 2020, the SEC issued a Wells Notice to USO.  The Wells Notice stated that the SEC had made a preliminary determination to recommend that the SEC file an enforcement action against USO for violating the 1933 Act and 1934 Act and Rule 10b-5 thereunder with respect to the Fund's disclosures to investors.

46.     On August 19, 2020, the CFTC similarly issued a Wells Notice to USO.  Like the proposed SEC enforcement action, the Wells Notice stated that the CFTC had made a preliminary determination to recommend that the CFTC file an enforcement action against USO for violating the Commodity Exchange Act and CFTC Regulations with respect to the Fund's disclosures to investors and recent activities.

47.     On November 8, 2021, the SEC issued a cease-and-desist order against USCF and USO resulting from their incomplete misleading disclosures to the market.

48.     In its March registration statement, USO claimed that the "average daily difference was (0.001)% (or (0.01) basis points" between USO's per share NAV and the price of its benchmark contracts.  Thus, the registration statement represented that USO had almost perfectly matched its investment objective since inception.  The registration statement also included a chart through December 31, 2019 showing the purportedly close correlation between USO's monthly returns and monthly benchmark contracts.

49.     In fact, the rapid growth of USO, which would accelerate as a result of the March Offering, meant that USO's stated investment strategy was already impracticable at the time of the offering and that the Fund could not achieve its investment objective.  Indeed, after the very first monthly roll following the launch of the March Offering, CME on behalf of the NYMEX intervened to impose strict positional limits on the Fund, thereby precipitating a rapid-fire and

complete overhaul of the Fund's investment strategy and sharp divergence from its stated investment objective.

50.     Similarly, the March registration statement claimed that "[i]nvestors may choose to use USO as a means of investing indirectly in crude oil."  The registration statement also stated that USO had been "designed to permit investors generally to purchase and sell USO's shares for the purpose of investing indirectly in crude oil in a cost-effective manner."  The registration statement likewise represented that USO's market price would "closely track" the daily changes in the spot price of WTI oil, reinforcing the false and misleading notion that investors could use USO as a cost-effective means of gaining exposure to crude oil prices.  The registration statement stated in pertinent part as follows:

> In addition, USCF believes that *market arbitrage opportunities will cause daily changes in USO's share price on the NYSE Arca on a percentage basis to closely track daily changes in USO's per share NAV on a percentage basis.*  USCF further believes that daily changes in prices of the Benchmark Oil Futures Contract have historically closely tracked the daily changes in spot prices of light, sweet crude oil.  USCF believes that *the net effect of these relationships will be that the daily changes in the price of USO's shares on the NYSE Arca on a percentage basis will closely track, the daily changes in the spot price of a barrel of light, sweet crude oil on a percentage basis, less USO's expenses.*

51.     Similarly, the March registration statement claimed that "the changes in the price of USO's shares as traded on the NYSE Arca *have closely tracked and will continue to closely track* on a daily basis, the changes in the spot price of light, sweet crude oil on a percentage basis."

52.     The March registration statement also provided the Fund's historical price premium over per share NAV through December 31, 2019, but did not provide this information for 2020.  The registration statement used this constrained historical view to claim that the

maximum price premium experienced by the Fund was 6.75%, ***when the Fund had suffered a 9.14% premium on March 18, 2020***.  The registration statement also downplayed the possibility that any significant price premium would regularly occur, claiming that the rare instances when the per share NAV and market price did not closely converge were attributable to differences in timing between market hours for the NYSE (on which the shares trade) and the NYMEX (on which the WTI futures traded).  These representations were materially false and misleading when made because the Fund was suffering drastic price premiums at the time of the March Offering that were far outside historical norms and not due to a difference in market hours.  Indeed, USO had suffered an extraordinarily high price premium of 4.63% or greater on ***three of the six days*** leading up to the March Offering, including the Fund's highest price premium ever, 9.14% suffered on March 18, 2020.  The March registration statement stated in pertinent part as follows:

> The table below shows the relationship between the trading prices of the shares and the daily NAV of USO, since inception through December 31, 2019.  The first row shows the average amount of the variation between USO's closing market price and NAV, computed on a daily basis since inception, while the second and third rows depict the maximum daily amount of the end of day premiums and discounts to NAV since inception, on a percentage basis.  ***USCF believes that maximum and minimum end of day premiums and discounts typically occur because trading in the shares continues on the NYSE Arca until 4:00 p.m. New York time while regular trading in the benchmark futures contract on the NYMEX ceases at 2:30 p.m. New York time and the value of the relevant benchmark futures contract, for purposes of determining its end of day NAV, can be determined at that time.***

|  |  | USO |
|---|---|---|
| Average Difference | $ | (.00)% |
| Max Premium % |  | 6.75% |
| Max Discount % |  | 4.51% |

The March registration statement stated that USCF employed a "'neutral' investment strategy in order to track changes in the price of the Benchmark Oil Futures Contract regardless of whether the price goes up or goes down."  The registration statement similarly highlighted that USO was "not actively managed," but instead simply "tracks the Benchmark Oil Futures Contract during periods in which the price of the Benchmark Oil Futures Contract is flat or declining as well as when the price is rising."  It continued in pertinent part:

> USO is not actively managed by conventional methods. Accordingly, *if USO's investments in Oil Interests are declining in value, USO will not close out such positions except in connection with paying the proceeds to an Authorized Participant upon the redemption of a basket or closing out futures positions in connection with the monthly change in the Benchmark Oil Futures Contract.*  USCF will seek to cause the NAV of USO's shares to track the Benchmark Oil Futures Contract during periods in which its price is flat or declining as well as when the price is rising.

53.     The March registration statement claimed that the Fund's investments remained highly liquid at the time of the March Offering, stating in pertinent part as follows:

> *USO invests only in Oil Futures Contracts and Other Oil-Investments that, in the opinion of USCF, are traded in sufficient volume to permit the ready taking and liquidation of positions* in these financial interests and in Other Oil-Related Investments that, in the opinion of USCF, *may be readily liquidated with the original counterparty or though a third party assuming the position of USO.*

54.     Likewise, the March registration statement mentioned applicable regulatory position limits but failed to disclose the USO was approaching these limits or that the necessary positional growth caused by the March Offering itself would result in the Fund running afoul of regulators, thereby jeopardizing the Fund's entire investment strategy and undermining its investment objective.

55.    In addition to the materially false and misleading statements in the February

Registration Statement and the March registration statement identified above, Defendants also

violated their affirmative obligations to provide certain material information in these offering

documents as required by applicable SEC rules and regulations.

56.    Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), requires

issuers to "[d]escribe any known trends or uncertainties that have had or that the registrant

reasonably expects will have a material favorable and unfavorable impact on net sales or

revenues or income from continuing operations."

57.    In May 1989, the SEC issued an interpretive release on Item 303 ("1989

Interpretive Release"), stating, in pertinent part, as follows:

> **The NYMEX current accountability level for any one month**
> **in the Benchmark Oil Futures Contract is 10,000 contracts.**
> In addition, the NYMEX imposes an accountability level for all
> months of 20,000 net futures contracts for light, sweet crude oil.
> In addition, the ICE Futures Europe maintains the same
> accountability levels, position limits and monitoring authority
> for its light, sweet crude oil contract as the NYMEX.  If USO
> and the Related Public Funds exceed these accountability levels
> for investments in the futures contracts for light, sweet crude
> oil, the NYMEX and ICE Futures Europe will monitor such
> exposure and may ask for further information on their activity
> including the total size of all positions, investment and trading
> strategy, and the extent of liquidity resources of USO and the
> Related Public Funds.  If deemed necessary by the NYMEX
> and/or ICE Futures Europe, USO could be ordered to reduce its
> futures contracts traded on such exchanges to below the 10,000
> single month and/or 20,000 all month accountability level.
>
> *            *            *
>
> **USO has not limited the size of its offering and is committed to**
> **utilizing substantially all of its proceeds to purchase Oil Futures**
> **Contracts and Other Oil-Related Investments.**  If USO encounters
> accountability levels, position limits, or price fluctuation limits for
> Oil Futures Contracts on the NYMEX or ICE Futures, it may then,
> if permitted under applicable regulatory requirements, purchase Oil

19

Futures Contracts on other exchanges that trade listed crude oil futures or enter into swaps or other transactions to meet its investment objective.  In addition, if USO exceeds accountability levels on either the NYMEX or ICE Futures and is required by such exchanges to reduce its holdings, such reduction could potentially cause a tracking error between the price of USO's shares and the price of the Benchmark Oil Futures Contract.

58.     The March registration statement similarly represented that "[t]he large size of the positions that USO *may acquire* increases *the risk* of illiquidity," without disclosing the significant illiquidity threats that USO was already experiencing as a result of the market-dominating positions that the Fund had already taken and was planning to take as a result of the March Offering.

59.     Further, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1)     Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

(2)     If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

60.     Similarly, on March 24, 2020, USO filed with the SEC on Form 8-K the financial statements and performance for USO for the year ended December 31, 2019.  The Form 8-K highlighted the Fund's 33.26% return during the year.  Further, the Form 8-K stated that "USO has performed an evaluation of subsequent events through the date the financial statements were

issued" and that this "evaluation did ***not result in any subsequent events*** that necessitated disclosures and/or adjustments."

61.     On April 16, 2020, USO filed with the SEC on Form 8-K an announcement that the Fund would substantially revise its investment strategy beginning the next day, such that the Fund would only invest 80% of its portfolio in front month WTI futures contracts.  However, this statement was materially misleading because it failed to disclose the specific reasons for the Fund's abrupt strategy change.  This statement was further misleading because it failed to disclose that on April 16, 2020, the CME, on behalf of the NYMEX, had sent a letter to USO specifically ordering it to limit the Fund's exposure to June WTI futures contracts, a drastic regulatory move that undermined the stated investment strategy and objective of the Fund and that signaled the sharp curtailment of USCF's investment discretion.  Substantially, the same material omissions were again made by Defendant in connection with a Form 8-K filed by USO on April 22, 2020, which also announced that the Fund had changed its investment objective but failed to provide the specific reasons and extraordinary regulatory intervention that had necessitated those changes.

62.     On April 21, 2020, USO filed with the SEC on Form 8-K an announcement that the SEC had yet to declare effective an S-3 registration statement for the sale of an additional four (4) billion USO shares, which had been filed the previous day.  This statement was materially misleading because it failed to disclose the specific reasons for the SEC's refusal to declare the registration statement effective.  In fact, the SEC would not declare the registration statement effective until nearly eight (8) weeks later, and only after the Defendant materially revised the disclosures to investors.

**FACTS CONCERNING PLAINTIFF'S TRADES**

63.     On April 20, 2020, Plaintiff purchased 1812 call option contracts on USO.  812 of the contracts expired in June 2020 with a strike price of 6 and 1000 of the contracts price of 6.5.

64.     On April 27, 2020, Plaintiff purchased 1000 call options on USO with a June 2020 expiration and strike price of 3.5.

65.     From April 23 through April 27, 2020, Plaintiff purchased 738 call options on USO with a June 2020 expiration and a strike price of 4.5.

66.     On April 27 and April 28, 2020, Plaintiff purchased 2000 call options on USO with a January 2021 expiration and a strike price of 5.50.

67.      Call Options are "securities" as defined in 15 U.S.C. §77b(a)(1).

68.     USO is a "person" as defined in 15 U.S.C. §77b(a)(2).

69.     USO is an "issuer" as defined in 15 U.S.C. §77b(a)(4).

**1934 ACT ALLEGATIONS**

**A.     The USO Defendant's Scienter**

1-69.   Paragraphs 1-69 of this Complaint are repeated and re-alleged as if fully set forth herein.

70.     Under the 1934 Act and SEC Rule 10(b)(5), USO and USCF are liable for: (i) making false and misleading statements as detailed herein; (ii) knowingly or recklessly failing to disclose adverse facts known to them about USO; and (iii) engaging in a fraudulent scheme to sell USO shares at artificially inflated prices, as detailed herein.  USO's fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of USO securities was a success, as it:  (i) deceived the investing public regarding USO's business, prospects and risks;

(ii) artificially inflated the prices of USO securities; and (iii) caused Plaintiff to purchase USO call options at artificially inflated prices.

71.     USO and USCF acted with intent in that USO and USCF: (i) knew, or at the very least were reckless in not knowing, that the public documents and statements they issued or disseminated in the name of the Fund were materially false and misleading when made; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statement or documents as primary violations of the federal securities laws.  USO and USCF, by virtue of their receipt of information reflecting the true facts regarding USO, its control over, and/or receipt and/or modification of the Fund's materially misleading statements were active and culpable participants in the fraudulent scheme alleged herein.

72.     USCF also made, or caused to be made, the false and misleading statements that artificially inflated the price of USO shares, including by signing the February Registration Statement and March Registration Statement and other documents filed with the SEC and posted to the Fund's website from February 2020 through May 2020.

73.     USO and USCF, as the creators, issuers and operators of the largest oil-related ETF in existence and dominant players in the complex commodities and futures markets impacting the Fund's performance, each possessed unique insider knowledge about the adverse facts, events, trends and uncertainties detailed herein.  USCF created the Fund, designed its investment objective, assessed its risks and likely performance, and were responsible for the daily management of the Fund.  USCF and USO also drafted and disseminated statements on behalf of the Fund to the investing public, including those detailed herein and issued during the

Class Period, and held themselves out as the persons and entities most knowledgeable about the Fund and the Factors impacting the Fund and its risk profile.

74.     USCF and USO had proprietary and privileged access to the complex and detailed market information described herein and sophisticated investment tools which gave them real-time and up-to-date data and analysis about, inter alia, crude spot prices, oil storage constraints, oil futures markets, the value of the Fund's holdings, short interest in the Fund, events and uncertainties impacting the price of oil-related securities, market demand for USO shares, the Fund's performance, market distortions, liquidity, volatility, and the complex convergence of these myriad factors and how they were affecting the Fund and the risks and performance of the fund.  USO was additionally responsible for trading tens of millions of dollars' worth of WTI futures on a daily basis and regularly updated, monitored and analyzed the key metrics and market information impacting the Fund.  Indeed, USO became a dominant force in the WTI futures market during the Class Period and was able to single-handedly influence WTI futures, providing it with unique insights about the performance and expected performance and risks impacting the Fund.

75.     USCF and USO also maintained regular communication and contact with various market players that provided information to them regarding the function of USO and the markets in which the fund operated.  These included the counterparties to the Fund's massive futures positions, the Fund's futures commission merchant, various regulatory authorities, custodial banks, the Fund's marketing agent, brokers, and other market participants who provided USCF and USO with vast amounts of information regarding the true performance of USO and the events, trends and uncertainties impacting the Fund as they were unfolding.  As a result of USCF and USO's central market role and access to and utilization of proprietary data feeds, vast

amounts of relevant market data, daily analysis of the complex and interrelated markets impacting the Fund, sophisticated investment and trading tools, and communication with a diverse range of key market players, USCF and USO knew or were reckless in not knowing the undisclosed facts detailed in ¶¶ 9-62.

76.     In addition, USCF and USO had the motive and opportunity to commit fraud and was highly incentivized to induce investors to commit assets to USO by concealing the true risks of such investments.  Specifically, USCF received fees for its management of Fund assets. These management fees were paid monthly at 0.45% per annum of the Fund's average daily net assets.  Thus, the profits realized by USCF was directly related to the amount of assets invested in USO.  As a result, as USO grew substantially in size, average monthly management fees paid by USO to USCF grew in tandem.

77.     The strategy of USCF to market and grow the Fund was a success.  USO grew to become the largest oil-related ETF in existence, and ultimately sold billions of dollars' worth of USO shares to investors, growing the number of USO shares issued and outstanding by ***more than 930%***.  If USCF and USO had disclosed the true events, trends and uncertainties impacting the Fund during the period from February 2020 to May 2020, USCF would have received substantially less fees because investors such as Plaintiff have been paid less to invest in the Fund or refused to invest in USO entirely.

### B.     Loss Causation And Economic Loss

78.     As detailed herein, USCF and USO engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of USO securities and operated as a fraud or deceit on purchasers of USO securities.  As detailed above, when the truth about USO's misconduct was revealed, the value of USO securities declined precipitously as the prior

artificial inflation no longer propped up the prices of such securities.  The declines in the prices of USO securities were the direct result of the nature and extent of Defendant's fraud finally being revealed to investors and the market.  The timing and magnitude of the share price declines negate any inference that the losses suffered by Plaintiff and members of the Class were caused by changed market conditions, macroeconomic or industry factors or Fund-specific facts unrelated to the Defendant's fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff was a direct result of USO's fraudulent scheme to artificially inflate the prices of USO securities and the subsequent significant decline in the value of the Fund's securities when USO' prior misrepresentations and other fraudulent conduct was revealed.

79.     The price of Plaintiff's call options on USO dropped as well as a result of USO and USCF's misleading statements.  As a result, Plaintiff's call options expired worthless.

80.      At all relevant times, USO's materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiff. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of the Fund's performance, business, risks and operations, as alleged herein. Before and during the time of Plaintiff's purchases of USO call options, USO issued materially false and misleading statements and omitted material facts necessary to make those statements not false or misleading, causing the prices of USO call options to be artificially inflated.  Plaintiff purchased USO call options at those artificially inflated prices, causing them to suffer losses of $79,919.97.

**C.     Applicability Of Presumption Of Reliance:  Fraud-On-The-Market Doctrine**

81.     At all relevant tines, USO securities traded in an efficient market for the following reasons, among others:

(a)      USO shares met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)      as a regulated issuer, USO filed periodic public reports with the SEC;

(c)      USO regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(d)      unexpected material news about the Fund was rapidly reflected in and incorporated into the price of the Fund's securities.

82.      As a result of the foregoing, the market for USO securities promptly digested current information regarding the Fund from publicly available sources and reflected such information in the prices of USO securities.  Under these circumstances, a presumption of reliance applies to Plaintiff's purchases of Fund securities.

83.      A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in significant part, on USCF and USO's material omissions. Because this action involves USCF and USO's failure to disclose material adverse information regarding the Fund's business, operations and risks, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of USCF and USO's material misstatements and omissions set forth above, that requirement is satisfied here.

**D.**     **No Safe Harbor**

84.     USCF and USO's false or misleading statements, alleged to be actionable herein, were not forward-looking statements ("FLS"), or were not identified as such by them, but rather, were statements of historical and present fact, and thus did not fall within any "Safe Harbor." Any purported "Safe Harbor" warnings accompanying any of USO's FLS failed to provide meaningful cautionary circumstances regarding the specific facts and circumstances facing the Fund, and thus were ineffective to shield those statements from liability.

85.     USCF and USO are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by USCF who knew that the FLS was false.  Further, none of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

**COUNT ONE**
**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against USCF and USO**

1-85.     Paragraphs 1-85 of this Complaint are repeated and re-alleged as if fully set forth herein.

86.     USCF and USO disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.     This Defendant violated Section 10(b) of the 1934 Act and Rule 10b-5 in that it:

      (a)      employed devices, schemes and artifices to defraud;

      (b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)      engaged in acts, practice and a course of business that operated as a fraud or deceit upon Plaintiff in connection with their purchases of USO securities.

88.    Plaintiff has suffered damages in that, in reliance on the integrity of the market, it paid artificially inflated price for USO call options.  Plaintiff would not have purchased USO securities at the prices paid, or at all, had it been aware that the market prices were artificially and falsely inflated by USO.

89.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in connection with its purchases of USO call options.

**COUNT TWO**
**For Violation of §20(a) of the 1934 Act**
**Against USCF**

1-89.    Paragraphs 1-89 of this Complaint are repeated and re-alleged as if fully set forth herein.

90.    USCF was a control person of USO within the meaning of Section 20(a) of the 1934 Act.

91.    By virtue of its position, and its ownership and contractual rights, participation in and/or awareness of USO's operations and/or intimate knowledge of the false and misleading statements filed by USO with the SEC and disseminated to the investing public, USCF had the power to influence and control and did influence and control, directly or indirectly, the decision-making of USO, including the content and dissemination of the various statements Plaintiff

contends are false and misleading.  USCF was additionally provided with, or had unlimited

access to, copies of USO's reports, press releases, public filings and other statements alleged by

Plaintiff to be misleading before and/or shortly after these statements were issued and had he

ability to prevent the issuance of the statements or cause the statements to be corrected.

92.     USCF meanwhile controlled the Fund as its commodity pool operator and

investment manager.

93.     USCF was a culpable participant in the violations of Section 10(b) of the 1934

Act alleged in the court above, based on its making of the materially false and misleading

statements described herein and otherwise taking actions which facilitated USO fraudulent

scheme and allowed it to be successfully completed.

**COUNT THREE**
**For Violation of Connecticut Uniform Securities Act**
**Against USO**

1-93.   Paragraphs 1-93 of this Complaint are repeated and re-alleged as if fully set forth

herein.

94.     USO is an issuer as defined in Conn. Gen. Stat. §36b-3(13).

95.     The call options Plaintiff purchased are securities as defined in Conn. Gen. Stat.

§36b-3(19).

96.     USO and USCF are persons within the definition of Conn. Gen. Stat. §36b-3(15).

97.     By the activities set forth in ¶ 9 through ¶ 62, USO and USCF made untrue

statements of material fact and omitted statements of material fact which were necessary to make

the statements made, under the circumstances made, not misleading in violation of Conn. Gen.

Stat. §36b-4(a).

98.     USCF is a control person of USO pursuant to Conn. Gen. Stat. §36b-249(c).

98.     Pursuant to Conn. Gen. Stat. §36b-29(a), Defendants are is liable to Plaintiff for damages, interest, costs and reasonable attorney's fees.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

      a.      damages;

      b.      interest pursuant to Conn. Gen. Stat. §36b-29(a); and

      c.      such other legal or equitable relief as the Court may deem appropriate.


                              **PLAINTIFFS**
                              **OPTIMUM STRATEGIES FUND I, LP and**
                              **UNITED STATES COMMODITY FUND, LLC**


                  By:      /s/ *Jeffrey Hellman*
                             Jeffrey Hellman, Esq.
                             Law Offices of Jeffrey Hellman, LLC
                             195 Church Street, 10th Floor
                             New Haven, CT  06510
                             Tel.: 203-691-8762
                             Fax: 203-823-4401
                             jeff@jeffhallmanlaw.com
                             Federal Bar No.: ct04102